JAMES ROACH, RESPONDENT, v. BENJAMIN B. O'DELL,
SHERIFF, ETC., APPELLANT.

*Jail — power of the board of supervisors to establish one — power of the board to
establish and alter jail liberties — 1875, chap. 482, sec. 1, subs. 1, 18 — Code of
Civil Procedure, sec. 147.*

Under the power "to purchase, or otherwise acquire for the use of the county,
real estate for sites  *  *  *  for jails and such other places of confinement as
may be authorized or required by law," and "to erect, alter, improve, pur-
chase and receive by gift buildings for any of such purposes," conferred upon
boards of supervisors by section 1 of chapter 482 of 1875, it is not necessary
that the board should purchase a site and then erect a building thereon. If the
county owns real estate with an appropriate building thereon, it may, under the
said act, appropriate a part of such building to be used as a jail.

It is not necessary that the jail should be acquired and established in such a
building by an express enactment of the board; it is sufficient if the part of
the building used for that purpose be recognized as a jail by the acts and
resolutions of the board.

Section 121 of the Code of Civil Procedure, providing that "the buildings now
used as the jails of the other counties of the State shall continue to be the jails
of those counties, respectively, until other buildings have been designated or
erected for that purpose according to law," applies not only to jails then law-
fully existing, but to buildings which were then, and had for many years prior
thereto, been used as jails, and recognized as such by the county authorities.

Chapter 482 of 1875, authorizing boards of supervisors, upon the recommendation
of the County Court, to establish, and from time to time to alter, the jail liber-
ties, repealed by implication the prior statutes conferring this power upon the
County Courts.

Under the said act of 1875 the board of supervisors has power to fix jail liberties
as a purely administrative act, or by the exercise of its legislative functions, as
provided in section 18 of subdivision 1 thereof.

In acting upon the subject of the jail liberties, in the exercise of its administra-
tive functions, the board is subject to the limitations contained in section 147 of
the Code of Civil Procedure, and cannot establish liberties exceeding 500 acres
in quantity; but in exercising the legislative power conferred upon it by said
section 18 of subdivision 1 of chapter 482 of 1875, it is not subject to the said
limitations and may establish jail liberties exceeding in extent 500 acres.

APPEAL from a judgment in favor of the plaintiff, entered upon
a verdict directed by the court, and from an order denying a motion
for a new trial made upon the minutes of the justice before whom
the action was tried.

*M. H. Hirschberg,* for the appellant.

*Reilly & Hamilton,* for the respondent.

Pratt, J. :

This is an action against the sheriff for an escape of one Kivlin, a judgment debtor, against whose body an execution had been issued for $3,000 recovery, and fifty-five dollars and eighteen cents costs in an action by the plaintiff for *crim. con.* The original judgment was recovered in Albany county November 4, 1881, and it was docketed in Orange county August 10, 1882. The execution was delivered to the defendant August 11, 1882, against Kivlin's property, which was returned September 11, 1882, wholly unsatisfied. The execution against Kivlin's person was issued November 17, 1882, and delivered to defendant, who, on the same day, arrested him and kept him in his custody, confining him in the cells connected with the Newburgh court-house until November 24, 1883, when he gave a bond in the usual form for the jail liberties and was released. In the meantime, and on the 23d day of November, 1883, the board of supervisors of Orange county, professing to act under chapter 482 of the Laws of 1875, upon the recommendation of the County Court, enacted that the jail liberties, which were then at Goshen, should be enlarged so as to include the city of Newburgh in cases where the person arrested was taken to the Newburgh court-house, and that the act should take effect immediately. The city of Newburgh is not contiguous to the jail limits at Goshen. It was assumed by the defendant and Kivlin that this act authorized the latter to be at large on bail within the city of Newburgh, and there is no proof that he at any time departed therefrom until the entry of the order of his discharge.

This action for an escape was commenced against the defendant December 9, 1882. On the 17th of March, 1883, Kivlin, conceding that he was still a prisoner on bail, made the usual application by petition for his discharge. Due notice of the application was given to the plaintiff and he appeared upon the hearing through his attorney, who had full authority in the premises.

On being brought before the court an order was made directing Kivlin to make an assignment of all his property, etc., to a trustee therein named. The assignment was made, and on the 24th of

March, 1883, the final order was made by this court directing his discharge from imprisonment. No question of the defendant's good faith can be predicated upon the testimony.

The plaintiff puts his case thus in his points : " The complaint charges an escape, first, for the detention in the cells (meaning the cells at the Newburgh court-house), and not as the law required in the county jail ; second, for the liberation of the prisoner in Newburgh where there were no jail liberties." It is thus apparent that this is not an ordinary case of escape, and that if defendant is held it must be *strictissimi juris.*

I have concluded that there was a legal jail at Newburgh, *i. e.,* that part of the court-house building which, prior to the present Code, was called the Newburgh cells. I think this fact appears independently of the Code. In 1875 the legislation, pursuant to act 3, section 17 of the Constitution, conferred further powers of local legislation and administration upon boards of supervisors (chap. 432), among which was the power to purchase or otherwise acquire real estate for sites for jails. It would seem plain that this power implied the right to acquire a jail, and that the board was not necessarily limited to the strict order of events indicated by the statute for such acquirement, *i. e.,* first, to acquire real estate for a site and then to erect a building for that purpose. If the county already had real estate and an appropriate building erected thereon, it would seem to be within this power to acquire a jail in such building. It does not appear that there was any express act of this Orange county board by which the county acquired this jail, but it is conceded that it owned the court-house building and that a part thereof was constructed so as to be appropriate for a jail. Having already acquired the property, it was only necessary to legalize it as a jail. The fact distinctly appears that after the passage of the act of 1875, this board repeatedly recognized the so-called " Newburgh cells " as a jail of the county of Orange. In 1875 it elected physicians to the Newburgh and Goshen jails respectively.

It received and acted upon the report of its committee on public buildings, including the " court-house and jails at Goshen and Newburgh." It fixed the prices of the board of prisoners at the Newburgh and Goshen jails. It allowed $100 for expenses incurred

in preventing the escape of prisoners from Newburgh jail. In 1876 it appointed committees on supplies for the court-houses and jails at Goshen and Newburgh." Various other important and unmistakable instances appeared in which the fact of a jail at Newburgh was distinctly recognized by this board until the present time.

If we deal with these as with similar acts of the legislature, it is plain that they furnish evidence that this local legislative body recognized the fact that a jail had been in some way "acquired" by the county of Orange at Newburgh. They are at all events evidence of the fact of a jail at that place, and in the absence of negative proof it must be presumed that it had been lawfully acquired. But independent of this view, it is very plain that this so-called jail at Newburgh had been used as a legal county jail for general purposes for more than thirty years. The Code (chap. 11, tit. 2, art. 2) enacts that " the building now used as a jail in the city of New York  *  *  *  shall continue to be the jail of the city and county of New York (sec. 120), and that "the buildings now used as the jails of the other counties of this State shall continue to be the jails of those counties respectively," etc. (Sec. 121.) This act was passed June 2, 1876. It took effect May 1, 1877. (See Laws 1876, chap. 448, § 1496.) It was suspended until September 1, 1877. (Chap. 318, Laws 1877.)

It is urged that the provisions which I have quoted, refer only to those buildings now used as the jails which were then lawfully used as jails. I am unable to concur in even this view. It seems to me that if the legislature had intended such a limitation, its purpose would have been more aptly expressed. The words referred to user simply. There is no limitation to lawful user, but simply to the fact of user for certain purposes. Suppose that the legislature had enacted that the lands now used as highways should continue to be highways; would it be pretended that a street or road which had theretofore been offered to the public, but which yet remained unaccepted, would not have been thereby accepted and legalized? Simply because some of the formalities, required by former statutes, in respect to acceptance had not been strictly complied with. This act was passed in view of the fact that a court-house had been erected at Newburgh, and that since the establish-

ment of the jail at Goshen, Newburgh had grown to be a large city, having new and important relations to the surrounding country and to the great business centers; so that considerations of convenience required an additional jail at that place, to be used in connection with the court-house. The legislature acted in view of notorious and long continued use of that place of confinement for the purposes of a jail, for the detention of persons confined under civil process, etc. But, be that as it may, this use of the cells in the Newburgh court-house, for the purposes of a jail, had been long recognized by the board of supervisors of Orange county in their public acts, and I am inclined to think that especially after the act of 1875, which conferred legislative power, including the subject of the acquirement of jails, such recognized use as a matter of fact came close to if it did not constitute a legalization of these cells as a jail. But, be that as it may, it certainly is the fact that such recognized use could not have been unknown to the legislature; it was therefore appropriate and reasonable that the building which contained those cells should be recognized and legalized by the legislature as a jail, for the general purposes specified in this section of the Code, and it is certainly also true that language was used which naturally and fairly referred to that court-house as one of the buildings then used as a jail. It did not cease to be a court-house because it was also a jail. The act is remedial in its nature and object, and must be interpreted liberally and according to the natural and popular meaning of the words in which it is expressed. I think that if the legislature had intended to speak only of the lawful existing jails it would at least have specified the existing jails and not the buildings which were then used as jails. It required no legislative enactment to continue the legal existence of a legal jail. I do not overlook the fact that the language is almost or quite identical with the former statute. That does not seem to me to affect the matter.

I think the construction upon which the plaintiff insists is too subtle, and it required the interpolation of a word which would not occur to the average citizen of average intelligence and even legal learning. It would be apt to mislead and result in precisely such hardships as that which the present case so aptly illustrates. I am therefore inclined to think that the county judge was correct, and

so hold, when in his recommendation to the supervisors he said that "the county of Orange had two jails."

The next question relates to the legality of the establishment of the entire city of Newburgh and "the jail liberties" of the Newburgh jail. I incline to the belief that the city limits were lawfully and properly established, as the boundaries of the jail liberties Formerly the power to establish jail liberties lodged with the old Court of Common Pleas. (2 R. S., 432, §§ 34, 35.) It then passed to the County Court as their successor. Those tribunals had the power to appoint and designate a reasonable space of ground adjacent to the jail, or jails, of such county to be denominated "jail liberties thereof." If there was more than one jail the power related to either or both. They also had power to alter these limitations. Generally speaking the original acreage of the jail liberties was 500 acres, and it was required that the territory should be adjacent to the jail and should be minutely described. But in cases where the liberty had been fixed by statute it seems to have been assumed that the acreage might be increased. These courts still had power to alter even those liberties thus specially fixed, subject only to the limitation that the new liberties should always include the old territory, the result would seem to be that in that class of cases the courts might alter by enlarging the liberties, but never by abridging them, so that the matter of mere acreage was never a vital point. It is also to be observed that their power "to appoint and designate" and "to alter" jail liberties was a purely administrative function.

In 1875 this administrative function was transferred to the board of supervisors, and the powers of the county courts were limited to the mere matter of recommendation. The powers in the courts and in the board are inconsistent, so that without looking for any express repeal of the old statute, at the time of the passage of the act of 1875, there was a plain repeal by implication, and the old power in the court was clearly repealed by the repealing acts which followed the present Code. Like every administrative power this power, in respect to jail liberties, was to be exercised by a resolution of the board, but the legislature did not stop here. It constitutionally conferred powers on the boards of supervisors which were purely legislative. I am unable to see why the legislative powers

thus delegated did not extend to the subject-matter of the admin-
istrative powers which were conferred at the same time.  If this
view is correct, the board of supervisors had the power to fix jail
liberties as a purely administrative act, or to exercise its legislative
functions "to establish, on the recommendation of the County
Court, and to alter, from time to time, as such court shall recom-
mend, the liberties of the jail or jails for the purposes defined by
statute."  (Sub. 18, § 1.)  It is not entirely clear that the legisla-
tive power thus conferred was to be exercised solely as an act in
the ordinary form of an enactment.  The second section seems to
assume that it might be done by resolution, but it is, nevertheless,
to be a resolution having a title and a statement of the vote whether
by two-thirds of a majority just like a statute.  It is at all events
plain that such resolutions were regarded as enactments.  The sixth
section uses that term.  The results of the legislative powers
were necessarily enactments.  It was, perhaps, unnecessary to make
special provision to that effect, but the sixth section distinctly
recognizes the force of such enactments as against existing statute
laws, the latter become "inoperative" as against the former.  Here,
then, we have two legislative bodies, the one superior and general,
the other inferior and local.  The legislative acts of each are nec-
essarily enactments as distinguished from the mere resolutions by
which the purely administrative acts are expressed.  Noting again
that the subject-matter of acquiring jails and the establishment of
jail liberties in the respective counties are within the subject-matter
of the legislative as well as the administrative power thus delegated,
and that these acts are purely local and so clearly within the consti-
tutional powers of the legislature, let us pass to the next point, *i. e.*,
that after these powers were thus delegated, this board of supervisors
proceeded in various ways to recognize the cells in this Newburgh
court-house as a jail.  Then followed the recommendation of the
County Court, that in view of the fact that the county of Orange
had two jails and had fixed no jail liberties for the Newburgh jail,
an act should be passed fixing the limits at Newburgh so as to
include the city of Newburgh.  Here was a recommendation for the
use of this legislative power.  An act was suggested in face of
section 147 of the Code which, substantially like the old statute,
limited the jail liberties to 500 acres.  The whole city of Newburgh,

comprising over 2,500 acres, was named as a proper territory. Then followed not a resolution but an enactment. It is called an act. It fully complies with all the formalities required by the sections of the act of 1875. Its title concisely expresses its contents, following which is a reference to the act of 1875 as the source of its authority for its passage, and then a statement that it was passed by an unanimous vote. Now, was this hostile to section 147 of the Code which required the board to limit itself to the 500 acres? I think not. Here are two legislative acts, there is no expressed repeal in or concurrent with the Code, which refers to the act of 1875; indeed the acts which are repealed are specified and *expressio unius*, etc.; again, if there is an express repeal of inconsistent provisions, the consistent provisions remain. Can these two legislative acts be harmonized? We are bound to harmonize them if that can be reasonably and fairly done. Indeed the repugnance between the two statutes must be plain and unavoidable before a repeal by implication will be adjudged. To what then may section 147 of the Code refer? I think it may fairly refer to the administrative powers of the board respecting jail limits, which might be exercised by mere resolution.

This power clearly existed from the passage of the act of 1875, when it was transferred from the county courts, down to the Code. If the administrative power only was exercised, its limitations were prescribed by the old statute respecting jail liberties, for that remained until the Code. But if the legislative power was exercised, it was done by enactment which rendered the existing statute inoperative. Why should this limitation of the Code be imposed upon the legislative power of the board. The act of 1875 marks a new policy in respect of local legislation. It is special legislation, without indicating the slightest purpose to abridge or recall any of this power to legislate upon the subject of jail liberties. It is said that the Code trenches upon this policy. I think not. Full force may be given to the Code if we confine it to the administrative function of the board to be expressed by resolution to be adopted by a mere majority of a quorum of the board of supervisors. Besides that this act of local legislation is subsequent to the Code. Does it not render section 147 of the Code inoperative in Orange county? The act of 1875 is to be construed prospectively, and upon general principles

it might properly enact a law for local purposes which, so long as within its legislative powers, would be valid as against a general act of the legislature. It would therefore seem that the establishment of these limits were fairly within the legislative power of the board notwithstanding section 147 of the Code, and as such was properly exercised. If the legislature could establish jail limits at Newburgh, which could include the whole city, this board might do the same thing. And it did do it.

Is it suggested that this act does not purport to establish but merely to enlarge the existing jail limits, *i. e.*, the Goshen limits?

Now, this act uses the word "extend" in its title and "enlarged" in the body thereof. But the recommendation of the County Court was that the limits be fixed. I have no difficulty in treating all these things as mere variations in phraseology, which mean the same thing, an exercise of the local legislative power to "establish" jail liberties for the Newburgh jail. Even if section 147 did limit this power, the fact that the acreage of the Newburgh limits was too great would not defeat the fact that limits were established so as to cast the *onus* of proving that Kivlin had been beyond the lawful limits, wherever they were, upon plaintiff, and thus to beat him for failure of proof. In this connection it may be well to note the effect of the final order for Kivlin's discharge. He certainly alleged that he was still a prisoner. Plaintiff might have defeated this application if Kivlin was not in fact a prisoner, and that too without making such election as would have defeated his right to sue for an escape. He was notified and made a party to that proceeding. He appeared by attorney. I think that in the absence of the whole record the presumption is that he presented that point. It certainly is adjudged by that final order that Kivlin was then a prisoner. But it is perhaps unnecessary to determine this point. I am satisfied upon the whole that this judgment should be reversed, and that a new trial should be ordered, with costs to the defendant to abide the event. Perhaps plaintiff may prove that Kivlin did not remain in Newburgh.

BARNARD, P. J., dissenting.

Present — BARNARD, P. J., DYKMAN and PRATT, JJ.

Judgment reversed and new trial granted, costs to abide event.